IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

TIN TRI NGUYEN,

       Petitioner,

     v.

JAMES TILTON, Secretary, California
Department of Corrections and Rehabilitation,

       Respondent.

_____/

No. 06-01414 JSW

**ORDER DENYING PETITION
FOR WRIT OF HABEAS CORPUS**

      Now before the Court is the petition for a writ of habeas corpus case pursuant to 28 U.S.C. § 2254 filed by California state prisoner, Tin Tri Nguyen ("Petitioner"). The Petition is now ripe for consideration on the merits and for the reasons set forth below, the Petition is DENIED.

**BACKGROUND**

      On December 14, 1998, Petitioner was convicted by a jury on one count of first degree murder, with a weapon enhancement and a felony-murder special circumstance, and one count of robbery, with a weapon enhancement. (Answer, Ex. 3.) On January 8, 1999, the trial court sentenced him to life without possibility of parole, plus four years. (*Id.*)

      On December 6, 2002, the California Court of Appeal affirmed Petitioner's conviction. (*Id.*, Ex. 6.) On February 19, 2003, the California Supreme Court denied review. (*Id.*, Ex. 7.) On May 13, 2004, Petitioner filed a habeas corpus petition in Santa Clara County Superior Court, which was denied on June 16, 2004. (*Id.*, Exs. 12, 13.) On August 11, 2004, Petitioner

**United States District Court**
For the Northern District of California

**United States District Court**
For the Northern District of California

1    filed a habeas corpus petition in the California Court of Appeal, which was denied on October

2    8, 2004.  (*Id.*, Exs. 14, 15.)  On December 8, 2004, Petitioner filed a habeas corpus petition in

3    the California Supreme Court, which was denied on February 23, 2006.  (*Id.*, Exs. 16, 17.)

4                                  **STATEMENT OF FACTS**

5    The facts underlying the charged offenses as found by the Court of Appeal of the State of

6    California, Sixth Appellate District, are set forth as follows:

7        On December 17, 1996, around noon, Stanko Vuckovic, a jewelry importer, drove to an
         apartment complex in San Jose to pick up Anh Vo, a Vietnamese woman who translated
8        for him in his business dealings with Vietnamese jewelry stores. Vuckovic and his
         business partner Mark Nehamkin imported gold jewelry and had received a large
9        shipment of gold valued at $60,000 - $80,000 wholesale for the 1996 Christmas season.
         Their Vietnamese business associate Denny Dang usually translated for them in their
10       business dealings, but in Decemb er 1996 he was on a trip to Vietnam. Dang had
         introduced Anh Vo to Vuckovic and Nehamkin to translate for them while he was gone.
11       Anh Vo knew the large shipment of gold had arrived and she frequently made
         appointments for Vuckovic and then accompanied him to various jewelry stores.[1]
12
         On Monday, December 16, 1996, Vo had cancelled an appointment to meet Vuckovic,
13       but she called and rescheduled for the next day, with Vuckovic to pick her up at her
         apartment at 12:30 p.m. Around 12:15 p.m. on December 17, Paula Proveaux, the
14       manager of the apartment complex, heard a gunshot fired. She had just seen two Asian
         men running in the parking lot. After the shot, she turned around and saw one of the
15       Asian males with his arm outstretched holding a gun. She ran to her apartment to call
         911. She then went to the parking lot and found Vuckovic lying on the ground
16       unresponsive. Proveaux encountered a distraught Anh Vo who said the victim was there
         to meet her. Sandra Patterson, a resident in the apartment complex heard a gunshot,
17       looked out her window, and saw a young Asian man with a gun walking towards the
         victim, who clutched his chest and said he had been shot. She saw another young Asian
18       man near a BMW and one or both drove away in the car. Another neighbor also saw a
         young Asian man with a gun in his hand standing over an older man on the ground near
19       a car. The medical examiner stated that Vuckovic died from the gunshot.

20       The main evidence at trial was presented through the testimony of accomplice Tien
         Tran.[2]  He testified as follows: On December 15, 1996, he lived in the Los Angeles area
21       and received a call from an acquaintance Tin Nguyen who invited him to take a trip to
         San Francisco. Tien Tran and his close friend Dat Pham[3] then went to a cafe to meet Tin
22       Nguyen and then went on to the home of Scott Nguyen (no relation to Tin). The four
         then departed for northern California about 11 p.m.--Scott Nguyen and Tin Nguyen in
23       Scott Nguyen's white, four-door Toyota and Tien Tran and Dat Pham in Pham's red

24  _____

25       [1] Anh Vo and her boyfriend (Danny Vu) were in significant financial trouble at the
     time.

26       [2] Tran was originally charged with first degree murder. He was allowed to plead
27   guilty to a lesser charge with a thirteen-year sentence.

28       [3] Tran said he and Pham were members of the Pomona Boys Gang; Tin was a
     member of the Black Dragons, an affiliated gang.

                                          2

Honda.[4]  Sometime along the way, Tin Nguyen tole them there was going to be a robbery.

When the two cars arrived in San Jose, they drove to the Garden City Casino and Scott Nguyen made a telephone call. A little while later, Anh Vo arrived at the casino and all got into the white Toyota. Anh Vo drove to a jewelry store, Kim Chi. During this trip, a plan to rob a man with a case of jewelry was discussed. Anh Vo would make an appointment for the man to bring his jewelry to the Kim Chi at noon that day and the others would rob him.

The group then drove to the Howard Johnson Motel. While Scott Nguyen rented a room, Anh Vo explained to the others that she made appointments for the man with the jewelry. The plan was to push the man down and grab the case containing the jewelry. At some point, Anh Vo told them the man drove an older gray BMW car. They drove back to Garden City to drop off Anh Vo. Scott Nguyen went back to the motel; the other three went to a coffee shop. Tien Tran, Dat Pham and Tin Nguyen agreed that Tin Nguyen would hit the man carrying the jewelry and Tien Tran would grab the case. They then went back to the motel to sleep.

Later that morning, as they drove to the Kim Chi jewelry store, Scott Nguyen told them that the plan was for Dat Pham to act as lookout while Tin Nguyen hit the man described by Anh Vo and Tien Tran grabbed the case. They would use two cars, with Scott Nguyen following Pham's car and if police appeared, [Scott] Nguyen would commit a traffic violation to distract the police and allow the others to escape. They would then rendezvous and return together to Los Angeles.

When they arrived at the jewelry store, Tin Nguyen and Tien Tran got out of the cars and walked to the store. They saw the man with the jewelry inside, but several other people were also in the store. Tin Nguyen decided not to proceed with the robbery then. Both got into the red Honda with Dat Pham and were followed by Scott Nguyen in his car back to the motel. Scott Nguyen made a phone call along the way, and told the others Anh Vo would make another appointment for the next day. They agreed to the same plan and to play the same roles.

Later that night, Tien Tran, Tin Nguyen and Dat Pham went out to party with some friends of Tin Nguyen. In the early morning hours of December 17, 1996, they were stopped and cited for a traffic violation by a San Jose police officer. Tran was driving the car, containing two male passengers. The field identification cards admitted at trial identified the passengers as Tin Nguyen and Dat Pham and described them. A search of car revealed duct tape and gloves.

About 11:30 a.m. on December 17, the conspirators awoke and went to a convenience store for Scott Nguyen to make a telephone call. After the call, he told the other three that the robbery would take place in an apartment complex. The group then drove to the Garden City Casino, parked the red Honda and headed toward the apartment complex in the white Toyota. They looked around the apartment complex, and as they were leaving, they saw the victim arrive in his car. Scott Nguyen drove the group back to the casino. He remained in his car and the other three got into Pham's red Honda. As they drove back to the apartment complex, Tin Nguyen took a gun he had previously loaned to Tran from its hiding place in Pham's car.

---

[4] Pham and Tran were often together. Tran frequently drove Pham's car because Pham's license was suspended.

United States District Court
For the Northern District of California

When the red Honda reached the apartment complex, Tin Nguyen and Tien Tran got out and ran to where Vuckovic was standing by his gray BMW. Tien Tran grabbed at the door handle of the driver's side and was grabbed by Vuckovic. Tin Nguyen then pointed the gun at Vuckovic, and Vuckovic grabbed Nguyen's hand with the gun. As the three men struggled, the gun went off. Vuckovic fell to the ground. Tin Nguyen ran off. Tien Tran got into the victim's car and drove it around the corner where he met up with Pham and Tin Nguyen. Tin Nguyen had located a briefcase and green bag in the car. Tien Tran grabbed the two items, then he and Tin Nguyen got into the red Honda which Dat Pham drove away. All four headed to Los Angeles on the freeway. At some point, the division of the proceeds was discussed, Tin saying he and Scott Nguyen would get the biggest shares. According to Tran, enroute to Los Angeles, Tin said that the gun went off accidentally and he had shot the victim.

When they arrived back in the Los Angeles area, they went to Henry Chung's house, where Tin Nguyen gave the gun and the briefcase to Henry Chung.[5]  On December 27, 1996, when a search warrant was served on his home, Chung asked his girlfriend [K]athy Nguyen to throw the remaining gun parts out the apartment window. She did, but the parts were recovered. Comparison of these parts with the shell casing from the crime scene showed the recovered parts belonged to the murder weapon.

Two police officers testified at trial about their questioning of Anh Vo and her statements. A tape of the interview was played for the jury at trial. Vo had been taken to the witness interview center at the police department early in the afternoon along with other witnesses. About 8:20 in the evening, Officer Torres and Officer Brown began questioning Vo in a homicide interview room. They asked her about her background, her family, her boyfriend her work and connection to the victim. She explained her boyfriend Danny Vu had gambling and financial problems. She also detailed her activities with Stanko Vuckovic and how she translated for him during his sales of gold jewelry to Vietnamese jewelry stores. Vo told about the cancelled appointment due to her illness on Monday. Then when she went to meet Vuckovic on Tuesday at her apartment complex, she found him lying on the ground having been shot.

During the course of the evening, the officers gave Vo breaks for the bathroom and for food and water and brought her a blanket. Around midnight, they took a walk to the bathroom and had an unrecorded conversation in a stairwell. She said they told her they did not believe her story and urged her to tell the truth. When the tape of the interview continued, Vo was crying and distraught. The officers read her Miranda[6] warnings, and she agreed to tell them about her involvement in the plan. She told them Scott Nguyen was an old friend and she had borrowed money from him in the fall. She told Scott about her connection to a jewelry salesman and they came up with a plan to steal the jewelry. Nguyen said she needed to do this for him and if she would tell him about the appointments, he would arrange to steal the jewelry. She initially agreed on condition that nobody would be hurt. Nguyen could not get to San Jose in time for the Saturday appointment and on Sunday she called to tell him she did not want to go through with the plan. Then early Monday morning, Nguyen arrived in San Jose with three companions and they called Vo to meet them. Vo said the other men looked like gang members and she did not want any part of the plan. She had dinner with Nguyen that night and he threatened her that she had to go through with the plan. He also offered her a percentage of the proceeds.

---

[5] Henry (Tran) Chung and Tin Nguyen were members of the same gang.

[6] *Miranda v. Arizona* (1966) 384 U.S. 436, 16 L. Ed. 2d 694, 86 S. Ct. 1602.

There was another break in the interview. When it resumed, Vo asked the officers if they were going to make a decision and whether she could go home. She said she wanted to spend Christmas with her family. The officers responded that they were trying to make a decision. Vo then admitted that she told Nguyen about her appointment with Vuckovic on Tuesday. He made a plan and told her he would attack Vuckovic but told her there was no gun involved. He said he would just jump both of them and take the jewelry. Vo said she believed the men would just push Vuckovic and her so they would fall. She denied seeing or knowing anything about a gun.

Several days after this interview, the police officers visited Vo in jail. They told her they had come through for her and convinced authorities not to charge her with murder. They urged her to keep cooperating. They said they would try to get her released on her own recognizance, but she had to keep cooperating.

Sergeant Torres also testified about a tape-recorded conversation he had with defendant's brother Tony Nguyen during which Tony said that defendant told him the robbery was supposed to be easy but the gun went off accidentally. The tape was played for the jury. Tony Nguyen testified that he had lied when he told the police officer what defendant supposedly had told him.

There was also testimony at trial that defendant could not be located for over a year after the killing, even with widespread law enforcement efforts. Defendant was finally located in Southern California in February 1998. As he was about to be arrested, he told his girlfriend he would not see her for a long time.

Defendant presented the testimony of Michael Tran, Tien Tran's brother. He testified to several telephone calls he received from Tien Tran soon after he was arrested. Tien said he was in the BMW when the victim was shot, and that no one would be able to identify Tin Nguyen because there was no one else around. He also said Tin Nguyen was the shooter.

Anh Vo testified in her own defense at trial. She described her life and background and explained that she and her boyfriend Danny Vu were in financial trouble, in part due to his gambling and drug use. During the fall of 1996, she got in touch with an old friend Scott Nguyen and borrowed money from him. Vo also described her work translating for the victim, a jewelry salesman, and admitted that she discussed with Scott Nguyen a scheme to steal gold from her employer as a favor because of the money she owed him. Scott Nguyen told her he would just grab the bag of jewelry she described and run. When the group of young men arrived from Southern California, she became worried that they would use force and she told Scott Nguyen she wanted out of the scheme. He told her she had to go through with the plan and that he would just grab the gold and run. When she went out of her apartment to meet Vuckovic that day she expected to see Scott Nguyen run up to him and grab the bag of jewelry. Instead she found Vuckovic on the ground mortally wounded.

(Answer, Ex. 6.)

## STANDARD OF REVIEW

This Court may entertain a petition for writ of habeas corpus "in behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in violation of the Constitution or law or treaties of the United States." 28 U.S.C. § 2254(a); *see*

5

**United States District Court**
For the Northern District of California

1   *also Rose v. Hodges*, 423 U.S. 19, 21 (1971).  Because the petition in this case was filed after

2   the effective date of the Antiterrorism and Effective Death Penalty At of 1996 ("AEDPA"),

3   AEDPA's provisions apply.  *See Little v. Crawford*, 449 F.3d 1075, 1079 (9th Cir. 2006) (citing

4   *Woodford v. Garceau*, 538 U.S. 202, 207 (2003)).

5          Under AEDPA, which provides for a deferential standard of review, a federal court may

6   grant the writ with respect to any claim that was adjudicated on the merits in state court only if

7   the state court's adjudication of the claim: "(1) resulted in a decision that was contrary to, or

8   involved an unreasonable application of, clearly established Federal law, as determined by the

9   Supreme Court of the United States; or (2) resulted in a decision that was based on an

10  unreasonable determination of the facts in light of the evidence presented in the state court

11  proceeding."  28 U.S.C. § 2254(d).  It is the habeas petitioner's burden to show he is not

12  precluded from obtaining relief by § 2254(d).  *See Woodford v. Visciotti*, 537 U.S. 19, 25

13  (2002).

14         "Clearly established federal law, as determined by the Supreme Court of the United

15  States" refers to "the holdings, as opposed to the dicta, of [the Supreme] Court's decisions as of

16  the time of the relevant state-court decision."  *Williams v. Taylor*, 529 U.S. 362, 412 (2000);

17  *Barker v. Fleming*, 423 F.3d 1085, 1093 (9th Cir. 2005) ("clearly established" federal law

18  determined as of the time of the state court's last reasoned decision); *Alvarado v. Hill*, 252 F.3d

19  1066, 1068-69 (9th Cir. 2001).  "Section 2254(d)(1) restricts the source of clearly established

20  law to [the Supreme] Court's jurisprudence."  *Williams*, 529 U.S. at 412.  The Supreme Court

21  has repeatedly explained that AEDPA, which embodies deep-seated principles of comity,

22  finality, and federalism, establishes a highly deferential standard for reviewing state-court

23  determinations.  *See id.* at 436.  Thus, the Court has emphasized that "[a] federal court may not

24  overrule a state court for simply holding a view different from its own, when the precedent from

25  [the Supreme] Court is, at best, ambiguous."  *Mitchell v. Esparza*, 540 U.S. 12, 17 (2003) (per

26  curiam).

27         Under § 2254(d)(1), a state court decision is "contrary to" clearly established United

28  States Supreme Court precedent "if it applies a rule that contradicts the governing law set forth

United States District Court

For the Northern District of California

in [Supreme Court] cases, 'or if it confronts a set of facts that are materially indistinguishable from a decision'" of the Supreme Court and nevertheless arrives at different result. *Early v. Packer*, 537 U.S. 3, 8 (2002) (quoting *Williams*, 529 U.S. at 405-06).  Under the "unreasonable application" clause of § 2254(d)(1), a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from the Supreme Court's decisions, but unreasonably applies that principle to the facts of the prisoner's case. *Williams*, 529 U.S. at 413.

A federal court "may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly.  Rather, that application must also be unreasonable." *Id.* at 412.  The objectively unreasonable standard is not a clear error standard. *Lockyer v. Andrade*, 538 U.S. 63, 75-76; *Clark v. Murphy*, 331 F.3d 1062, 1067-69 (9th Cir.), *cert. denied*, 540 U.S. 968 (2003).  After *Lockyer*, "[t]he writ may not issue simply because, in our determination, a state court's application of federal law was erroneous, clearly or otherwise.  While the 'objectively unreasonable' standard is not self-explanatory, at a minimum it denotes a greater degree of deference to the state courts than [the Ninth Circuit] ha[s] previously afforded them." *Clark*, 331 F.3d at 1068.

In determining whether the state court's decision is contrary to, or involved an unreasonable application of, clearly established federal law, a federal court looks to the decision of the highest state court to address the merits of a petitioner's claim in a reasoned decision. *LaJoie v. Thompson*, 217 F.3d 663, 669 n.7 (9th Cir. 2000); *Packer v. Hill*, 291 F.3d 569, 578-79 (9th Cir. 2002), *rev'd on other grounds*, 537 U.S. 3 (2002).  If the highest state court has denied a petitioner's claim summarily, the habeas court may "look through" that decision to the last state court addressing the claim in a reasoned decision. *See Shackleford v. Hubbard*, 234 F.3d 1072, 1079 (9th Cir. 2000) (citing *Ylst v. Nunnemaker*, 501 U.S. 797, 803-04 (1991)).  The standard of review under AEDPA is somewhat different where the state court gives no reasoned explanation of its decision on a petitioner's federal claim and there is no reasoned lower court decision on the claim.  In such a case, a review of the record is the only means of deciding

1   whether the state court's decision was objectively reasonable.  *See Himes v. Thompson*, 336

2   F.3d 848, 853 (9th Cir. 2003); *Greene v. Lambert*, 288 F.3d 1081, 1088 (9th Cir. 2002).

3       A federal habeas court may also grant the writ if it concludes that the state court's

4   adjudication of the claim "resulted in a decision that was based on an unreasonable

5   determination of the facts in light of the evidence presented in the State court proceeding."  28

6   U.S.C. § 2254(d)(2); *Rice v. Collins,* 126 S. Ct. 969, 975 (2006).  A district court must presume

7   correct any determination of a factual issue made by a state court unless the petitioner rebuts the

8   presumption of correctness by clear and convincing evidence.  28 U.S.C. § 2254(e)(1).  This

9   presumption is not altered by the fact that the finding was made by a state court of appeal, rather

10   than by a state trial court.  *Sumner v. Mata*, 449 U.S. 539, 546-47 (1981); *Bragg v. Galaza*, 242

11   F.3d 1082, 1087 (9th Cir.), *amended*, 253 F.3d 1150 (9th Cir. 2001).

12       Habeas relief is warranted only if the constitutional error at issue is a structural error or

13   had a "'substantial and injurious effect or influence in determining the jury's verdict.'"  *Penry*

14   *v. Johnson*, 532 U.S. 782, 795-96 (2001) (quoting *Brecht v. Abrahamson*, 507 U.S. 619, 638

15   (1993)).  Under this standard, if the federal court determines that the state court's harmless error

16   analysis was objectively unreasonable, and thus an unreasonable application of clearly

17   established federal law, the federal court then proceeds to the *Brecht* analysis.  *Id.* at 787.

### DISCUSSION

19       Petitioner seeks relief based on six claims: (1) ineffective assistance of counsel; (2)

20   violation of his due process rights based on the admission of involuntary witness statements; (3)

21   violation of his due process rights based on admission of involuntary photo identification by co-

22   defendant Vo; (4) violation of his due process rights because there was insufficient evidence to

23   support the jury's finding; (5) violation of his due process rights based on prosecutorial

24   misconduct; and (6) violation of his due process rights based on the denial of a witness's

25   request for an interpreter and the trial court's comments regarding the witness's ability to

26   understand English.  (Pet. at 5-8.)

27

28

United States District Court
For the Northern District of California

**United States District Court**
For the Northern District of California

**I.      Ineffective Assistance of Counsel.**

Petitioner contends that he was deprived of the effective assistance of counsel in violation of the Sixth Amendment.  He claims that trial counsel was ineffective for failing to: (1) object to the admission of field identification evidence; (2) object to evidence of gang membership after the judge had tentatively ruled it inadmissible; and (3) prepare witnesses for trial testimony.  (Pet. at 5-6.)  Additionally, Petitioner contends that trial counsel was ineffective for failure to: (4) move to suppress the statements of witnesses; (5) object when the trial judge refused a witness's request for an interpreter; and (6) object to prosecutorial misconduct.  These three claims will be addressed in other sections of this order, where appropriate.  Lastly, Petitioner claims that appellate counsel was ineffective for failure to raise trial counsel's inaction regarding the interpreter, witness preparation, prosecutorial misconduct, and the suppression of witness statements.  (Pet. at 6.)

**A.      Standard for Ineffective Assistance of Counsel.**

A claim of ineffective assistance of counsel is cognizable as a claim of denial of the Sixth Amendment right to counsel, which guarantees not only assistance, but effective assistance of counsel. *Strickland v. Washington*, 466 U.S. 668, 686 (1984); see also *Williams*, 529 U.S. at 404-08 (2000).  "The benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied upon as having produced a just result." *Strickland*, 466 U.S. at 686.

In order to prevail on a Sixth Amendment ineffectiveness of counsel claim, Petitioner must establish: (1) that counsel's performance was deficient, *i.e.*, fell below an objective standard of reasonableness under prevailing professional norms; and (2) that he was prejudiced by counsel's deficient performance, *i.e.*, that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694.  A reasonable probability is a probability sufficient to undermine confidence in the outcome.  *Id.*  A petitioner has the burden of showing by evidentiary proof that counsel's deficient performance caused him prejudice.  *See Tomey v. Brunnell*, 898 F.2d 741, 743 (9th Cir. 1990).  A petitioner can make out a claim of ineffective assistance of counsel only by

United States District Court

For the Northern District of California

1   pointing to specific errors made by trial counsel and by showing that these errors were not the

2   result of reasonable professional judgment.  *See United States v. Cronic*, 466 U.S. 648, 666

3   (1984); *Strickland*, 466 U.S. at 690.  A petitioner must also overcome a strong presumption that

4   counsel "rendered adequate assistance and made all significant decisions in the exercise of

5   reasonable judgment." *Strickland,* 466 U.S. at 690.

6        It is unnecessary for a court to address the prejudice prong of the *Strickland* test if the

7   petitioner cannot even establish a deficiency under the first prong.  *See Siripongs v. Calderon*,

8   133 F.3d 732, 737 (9th Cir. 1998).  However, a court need not determine whether counsel's

9   performance was deficient before examining the prejudice suffered by the petitioner as a result

10  of the alleged deficiencies.  *See Strickland*, 466 U.S. at 697; *Williams v. Calderon*, 52 F.3d

11  1465, 1470 n.3 (9th Cir. 1995) (approving district court's refusal to consider whether counsel's

12  conduct was deficient after determining the petitioner could not establish prejudice).

13               **B.      Admission of the Field Identification Evidence.**

14       Petitioner contends that he was deprived of effective assistance of counsel because his

15  counsel failed to object to field identification evidence of defendant obtained during a traffic

16  stop.  (Pet. at 5.)  The Court of Appeal was the last state court to address the merits of this claim

17  in a reasoned decision, and as such, the Court looks to that court's analysis of this claim.

18  (Answer, Ex. 6.)

19       At 1 a.m. on December 17, 1997, San Jose Police Officer Booth stopped a red Honda for

20  a vehicle code violation.  (*Id*. at *14.)  The car was driven by Tien Tran ("Tran"), who was

21  riding with two passengers, Dat Pham ("Pham") and Petitioner.  (*Id*.)  After giving the citation,

22  the officer identified the passengers and ran warrant checks.  (*Id*.)  He also received permission

23  from Tran to search the car and found a pair of gloves and duct tape belonging to Tran.  (*Id*.)

24  Officer Booth filled out field identification cards on Tran, Pham and Petitioner.  (*Id*. at *14-15.)

25       On May 28, 1998, the trial court consolidated Petitioner's case with previously filed

26  cases involving murder and robbery charges against Scott Nguyen, Pham, and Ahn Vo.  (CT

27

28

167.)[7]  Tran, who also had been a co-defendant, had entered into a plea agreement with the

prosecution on May 14, 1998 and served as the prosecution's chief witness.  (*Id*. at 159.)

During pre-trial proceedings, co-defendant Pham moved to suppress the evidence seized by

Officer Booth.  The court granted the motion, ruling that the stop was illegally prolonged before

the passengers were identified and the car was searched, but after the driver and the car itself

were identified.  (*Id*. at 181.)  Pham and Petitioner's identifications, along with the items found

during the search, were suppressed.  However, the court did not suppress the identification of

Tran and the vehicle itself.  (*Id*. at 182.)

During pre-trial proceedings, Petitioner moved to sever his trial from that of his co-

defendants Pham and Scott Nguyen, arguing his need to use the suppressed field identification

cards to impeach Tran's testimony.  (*Id*. at 176-79.)  The court granted the motion to sever and

admitted all three field identification cards.  (*Id.* at 198.)

At trial, Petitioner's trial counsel introduced the identification cards to show that Tran

had actually been wearing the jacket described by witnesses at the shooting scene and that

Tran's hairstyle fit the description of the shooter more than Petitioner's hairstyle did.  (RT

609.)[8]  Officer Booth testified about the stop, and referred to the identification cards to describe

the driver and passengers.  He described Tran as wearing a black and white jacket and tan

slacks, with a tattoo "Saigon" on his left forearm, and having spiked hair.  (*Id*. at 609-13, 618.)

Booth also read Petitioner's field identification, describing him as a Vietnamese male,

approximately five feet, seven  inches and 110 pounds, wearing a gray v-neck sweatshirt, black

pants and boots, with scars on his left forearm, but no tattoos.  (*Id.* at 613-14, 618.)  The

prosecution asked Booth if he could identify Petitioner as a passenger in the car.  (*Id.* at 614.)

Booth stated that he could not identify Petitioner from an independent recollection, but that he

[7] "CT" hereinafter refers to the "Clerk's transcript on appeal from the judgment of the Superior Court of the State of California, in and for the County of Santa Clara," filed March 30, 1999.

[8] "RT" hereinafter refers to the "Reporter's Transcript on appeal from the judgment of the Superior Court of the State of California in and for the County of Santa Clara before the Honorable John T. Ball, Judge," filed March 30, 1999.

United States District Court

For the Northern District of California

11

United States District Court

For the Northern District of California

could identify him from the field identification card and his scar.  Subsequently, Petitioner's

trial counsel stipulated that Petitioner was in the car that night.  (*Id.* at 614-15.)  Petitioner now

argues that trial counsel was constitutionally ineffective for admitting this evidence.

Petitioner asserts that the admission of his identification card was not tactical, and

instead served to corroborate Tran's testimony that Petitioner participated in the robbery.  He

contends that trial counsel's decision was a product of ignorance and that it was based upon the

mistaken belief that in order to have Tran's card admitted, Petitioner's card also had to be

admitted.  Petitioner argues that trial counsel should have used only Tran's card to show that

Petitioner did not fit the eyewitnesses' descriptions of the shooter.

The Court of Appeal rejected this claim and found that Petitioner's counsel had made a

reasonable tactical choice.  (Answer, Ex. 6 at *17.)  The court held that introduction of

Petitioner's field identification was sound trial strategy because there was a valid, informed

reason for admitting both Tran and Petitioner's field identification cards.  (*Id.*)  Tran's field

identification was necessary because it tended to show that Tran fit the description of the

shooter.  (*Id.* at *18.)  However, only admitting Tran's field identification "would have allowed

for the possibility that defendant also fit that description at that time.  Only by introducing his

own field identification card could defendant show that he did not fit the description."  (*Id.*)

The Court thus held that trial counsel's strategic decision to distinguish Petitioner from the

shooter falls well within the "wide range of reasonable professional assistance" that is

acceptable under *Strickland*.  (*Id.*)  The Court finds that the state appellate court's determination

was not contrary to clearly established federal law.

Even if the admission of the field identification information was an unreasonable trial

strategy, the Petitioner must show that counsel's errors were so serious as to deprive him of a

fair trial.  *Strickland*, 466 at 688.  Petitioner argues that because Tran's accomplice testimony

was inherently suspicious, the field identification gave Tran's testimony the requisite

corroboration to grant it credibility in the jurors' eyes.  Petitioner suggests that but for the

introduction of the field identification evidence, the jury would have continued to remain

suspicious of Tran's testimony and found Nguyen not guilty.  It is true that the field

12

identification did corroborate Tran's testimony.  However, the Court of Appeal found that there

was sufficient evidence aside from the field identification to corroborate Tran's testimony:

> For example, defendant's brother Tony Nguyen acknowledged that he told the police that defendant had told him that he was involved in a robbery of gold, which was supposed to be an easy job, but the gun went off accidentally.  The gun parts recovered from Henry Chung's house were consistent with the gun used in the shooting.  Defendant fled for nearly a year after the shooting, demonstrating a consciousness of guilt.  He told his girlfriend that she would not be seeing him for a long time just before he was finally arrested.

(Answer, Ex. 6 at *18-19.)  Therefore, the court found that there was "reasonable probability

that the jury would have reached a more favorable conclusion even had the field identification

cards not been admitted at trial."  (*Id.* at 19.)  The Court finds that Court of Appeal did not err in

determining that the admission of the field identification did not prejudice Petitioner.  As the

admission of the field identification evidence was a reasonable trial tactic that did not prejudice

Petitioner, the Court of Appeal did not improperly apply *Strickland* in finding that there was not

a constitutional deprivation of Petitioner's right to effective counsel.

### C.   Admission of Evidence of Gang Membership.

Next, Petitioner contends that his counsel was ineffective because he failed to object to

trial testimony that Petitioner was a gang member.  The Court of Appeal was the last state court

to address the merits of this claim in a reasoned decision, and as such, the Court looks to that

court's analysis of this claim.  (Answer, Ex. 6.)

Prior to trial, the court ruled that gang related evidence was probably more prejudicial

than probative, and directed counsel not to mention it without a further ruling from the court.

(RT 51-52.)  However, during trial, the prosecutor asked several witnesses about their

knowledge of Petitioner's gang involvement, and referenced gang membership during his

closing arguments.  Petitioner's trial counsel did not object to these references.  (*See e.g.* RT

378, 452-53, 521-22, 1348.)

Petitioner argues that evidence of association with gang activity has a highly

inflammatory impact on the jury because jurors may conclude that a defendant committed the

charged offenses based on his association with a gang.  Generally, use of gang membership

evidence to imply "guilt by association" is impermissible and prejudicial.  *Kennedy v. Lockyer*,

379 F.3d 1041, 1056 (9th Cir. 2004). However, while gang membership evidence cannot be used to prove substantive elements of the crime, it may be used for other purposes during trial such as impeachment. *Id.*

As discussed *supra*, judicial scrutiny of counsel's performance must be highly deferential, and a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance. *See Strickland*, 466 U.S. at 689. The Court of Appeal noted that although there was testimony that Petitioner was a member of the Black Dragon gang, there was also testimony that he was not. (Answer, Ex. 6 at *20.) Furthermore, the Court noted that "[t]he prosecutor had also used the various gang references to show connections between all the defendants and some of the witnesses." (*Id.*) This, the court noted, could "reflect on the witnesses's testimony or on the identification of those involved." (*Id.* at *20-21.) Thus, the gang evidence was not used to prove a substantive element of the crime, but for other purposes such as impeachment. Finally, the Court of Appeal noted that even though the gang evidence was introduced, the result of the trial would not have been different because the "corroborated testimony of the accomplice Tran directly identified defendant as a participant in the crimes." (*Id.* at *21.)

The Court finds that the Court of Appeal's determination that the defense counsel's challenged acts were not prejudicial is not an unreasonable application of controlling federal law.

**D.    Failure to Prepare Jenny Nguyen and Tony Nguyen to Testify.**

Petitioner next claims that his trial counsel was ineffective because he failed to properly prepare Jenny and Tony Nguyen before they testified in court. (Pet. at 6.) The Superior Court was the last state court to address the merits of this claim in a reasoned decision, and as such, the Court looks to that court's analysis of this claim. (Answer, Ex. 13.)

The prosecution called Tony Nguyen, who is Petitioner's brother, and Jenny Nguyen, Tony's wife, as witnesses in order to question them about a conversation they had previously had with the police. Tony and Jenny had previously told police that Petitioner had called them after the crime, telling them that he was really scared because the gun had accidentally gone off.

14

**United States District Court**
For the Northern District of California

1   (RT 365-66.)  These conversations had been tape-recorded without Tony and Jenny's

2   knowledge and neither the prosecution nor the defense had shown them the transcripts prior to

3   trial.  (RT 363-69.)  However, on the witness stand, Jenny denied that she had spoken to

4   Petitioner, and Tony testified that he had been lying when he spoke to the police.  (RT 365-79.)

5   At trial, the prosecutor introduced the transcripts of the telephone conversation as evidence of

6   prior inconsistent statements by Jenny and Tony.  (RT 362-63.)

7            Petitioner claims that he was deprived of the effective assistance of counsel because

8   counsel did not show Tony and Jenny the transcripts before they testified.  (Pet. at 6.)  Petitioner

9   contends that their lack of preparation caused them to be confused on the stand, which made

10   them appear deceptive.  (Petitioner's Memorandum ("Pet.'s Mem.") at 13.)  In addressing this

11   issue, the Superior Court held that "it appears that both witnesses were the prosecution's

12   witnesses; therefore it is not clear on what basis the defense would prepare them and whether

13   preparing them would have had a reasonable probability of changing the result."  (Answer, Ex.

14   13 at 15.)

15            While there is Supreme Court precedent requiring trial counsel to prepare his or her own

16   witnesses, *see Alcala v. Woodford*, 334 F.3d 862, 889-90 (9th Cir. 2003), there is no Supreme

17   Court precedent requiring a criminal defendant's trial counsel to prepare any of the

18   prosecution's witnesses.  Therefore, Petitioner has not shown that the Superior Court's

19   determination was contrary to clearly established federal law nor or resulted in a decision that

20   was based on an unreasonable determination of the facts in light of the evidence presented in

21   the state trial court proceeding.

22   **II.       Admission of Ahn Vo's Statement.**

23            Petitioner argues that the admission of Ahn Vo's identification of Petitioner in a police

24   line up was a violation of his Fourteenth Amendment due process rights because her

25   identification of Nguyen was involuntary, and therefore inadmissible.  (Pet.'s Mem. at 20-21.)

26   During trial, the prosecution called Sergeant Torres as a rebuttal witness.  Officer Torres

27   testified that during an interrogation, co-defendant, Anh Vo, tentatively identified Petitioner in a

28   photo line-up.  (RT 1323.)  The Court of Appeal in Vo's companion case upheld the trial court's

United States District Court

For the Northern District of California

1    finding that Vo's statements were voluntary and admissible.  (Answer, Ex. 8 at *22-23.)  The

2    court in that case concluded that the police had not made improper promises of leniency and

3    that Vo's trial testimony of the conversation "reflected her motivation to tell the truth once she

4    realized the officers were suspicious of her truthfulness."  (*Id*. at *20.)  In Petitioner's case, the

5    Court of Appeal relied on the court's analysis in Vo's companions case regarding its

6    determination of his claim that his due process rights were not violated.  (Answer, Ex. 6.)  The

7    Court of Appeal in the campanion case was the last state court to address the merits of this

8    claim in a reasoned decision, and as such, the Court looks to that court's analysis of this claim.

9           A defendant may assert his own due process right to a fair trial as a valid objection to

10   the introduction of statements extracted from a non-defendant by coercive tactics.  *Williams v.*

11   *Woodford*, 384 F.3d 567, 593 (9th Cir. 2004).  Involuntary confessions in state criminal cases

12   are inadmissible under the Fourteenth Amendment.  *Blackburn v. Alabama*, 361 U.S. 199, 207

13   (1960).  The voluntariness of a confession is evaluated by reviewing both the police conduct in

14   extracting the statements and the effect of that conduct on the suspect.  *Miller v. Fenton*, 474

15   U.S. 104, 116 (1985); *Henry v. Kernan*, 197 F.3d 1021, 1026 (9th Cir. 1999).  To determine the

16   voluntariness of a confession, the court must consider the effect that the totality of the

17   circumstances had upon the will of the defendant.  *Schneckloth v. Bustamonte*, 412 U.S. 218,

18   226-27 (1973).  "The test is whether, considering the totality of the circumstances, the

19   government obtained the statement by physical or psychological coercion or by improper

20   inducement so that the suspect's will was overborne."  *United States v. Leon Guerrero*, 847

21   F.2d 1363, 1366 (9th Cir. 1988) (citing *Haynes v. Washington*, 373 U.S. 503, 513-14 (1963));

22   *Clark v. Murphy*, 331 F.3d 1062, 1073 (9th Cir. 2003) (holding that state court's determination

23   that interrogation was non-coercive, where suspect was interrogated over 5-hour period in 6 by

24   8 foot room without water or toilet (but never requested water or use of a toilet), was

25   objectively reasonable application of *Schneckloth*); *United States v. Okafor*, 285 F.3d 842, 846-

26   47 (9th Cir. 2002) (customs agent's statements to defendant that he would be subject to 10-20

27   years in prison and it would be to his benefit to cooperate with authorities, as well as customs

28   agent's statement that he would let the government know if defendant cooperated, did not

render subsequent confession involuntary).  A confession is only involuntary if the police use coercive activity to undermine the suspect's ability to exercise his free will.  *Derrick v. Peterson*, 924 F.2d 813, 818 (9th Cir. 1990), *cert. denied*, 502 U.S. 853 (1991).  Encouraging a suspect to tell the truth is not coercion.  *Amaya-Ruiz v. Stewart*, 121 F.3d 486, 494 (9th Cir. 1997).

Petitioner may only succeed on this claim if the Court of Appeal decision regarding Vo's identification of Petitioner was contrary to clearly established federal law, or resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding.  Neither condition is satisfied in this case.

In determining whether or not Vo's confession was voluntary, the Court applied the "totality of the circumstances" test outlined in *Schneckloth*.  It considered whether there was any police coercion, the length of the interrogation, its location, its continuity, as well as the Vo's maturity, education, physical condition, and mental health.  (Answer, Ex. 8 at *14-15.) Having considered the circumstances of the interrogation, the court found that a reasonable person in Vo's situation would not have believed that she was initially in custody, and would have felt that she was free to leave.  (*Id*. at *18.)  Additionally, the court found that as a matter of fact, no promises of leniency were made to Vo during her interrogation.  (*Id*. at *18-19.) Even if such statements of leniency were made, the court found that those statements were not the motivating factor of the confession.  (*Id*.)  Rather, the court found that the motivating factor was Vo's awareness that the police officers were suspicious of her truthfulness.  (*Id*.) Examining the record, this Court agrees with the Court of Appeal in its finding that Vo exercised her free will in submitting her statements.  The court's finding was not contrary to established federal law, nor was it an unreasonable determination of the facts in light of the evidence presented in the state proceedings.  Therefore, Petitioner's due process rights were not violated by the admission of Vo's identification of Petitioner.

**III.    Trial Testimony of Henry Chung and Kathy Nguyen.**

Based on Tran's confession, the police searched the home of Henry Chung and found parts of a gun.  They arrested Henry and his girlfriend, Kathy Nguyen, and brought them to the

1   police station for questioning.  Petitioner contends that the statements from Henry and Kathy

2   made during this questioning were a product of police coercion and that their introduction

3   during Petitioner's trial was therefore a violation of his due process rights.  (Pet.'s Mem. at 16.)

4   Additionally, Petitioner claims that en route to trial, Henry was pressured by police officers to

5   testify consistently with his previous interrogation statements, and therefore Henry's trial

6   testimony was also introduced in violation of his due process rights.

7        Petitioner cites to his own declaration and those of Henry Chung and Kathy Nguyen, to

8   support the contention that Kathy and Henry's police statements were involuntary.  These

9   declarations were made five and a half years after trial.  (Traverse, Ex.1)

10        Neither the appellate court on direct appeal, nor the superior court in the state habeas

11   petition, addressed whether Kathy and Henry's statements were inadmissible, or whether the

12   statements were prejudicial.

13        It is a violation of due process if the:

14       State has contrived a conviction through the pretense of a trial which in truth is
    but used as a means of depriving a defendant of liberty through a deliberate

15       deception of court and jury by the presentation of testimony known to be
    perjured.  Such a contrivance by a State to procure the conviction and

16       imprisonment of a defendant is as inconsistent with the rudimentary demands of
    justice as is the obtaining of a like result by intimidation.

17   *Mooney v. Holohan*, 294 U.S. 103, 112 (1935).  However, the existence of perjured testimony

18   in and of itself is not enough for habeas relief.  Petitioner is only entitled to habeas relief if the

19   trial court's admission of Henry and Kathy's testimony rendered the trial so fundamentally

20   unfair as to violate due process.  See *Karis v. Calderon*, 283 F.3d 1117, 1129 n. 5 (9th Cir.

21   2002); *Jeffries v. Blodgett*, 988 F.2d 923, 934-35 (9th Cir. 1993).  Thus, the Court must decide

22   whether, despite the use of perjured testimony, Petitioner received a "'trial resulting in a verdict

23   worthy of confidence.'"  *Hall v. Dir. of Corr.*, 343 F.3d 976, 984 (9th Cir. 2003) (per curiam)

24   (quoting *Kyles v. Whitley*, 514 U.S. 419, 434, 115 S. Ct. 1555, 131 L. Ed. 2d 490 (1995)).

25        After carefully reviewing the record, the Court finds that it is unnecessary to determine

26   the voluntariness of Henry and Kathy's statements because in any event Petitioner was not

27   prejudiced by the admission of their statements to police prior to trial.  It is true, as Petitioner

28   argues, that the prosecutor mentioned the statements of Henry Chung and Kathy Nguyen as

United States District Court

For the Northern District of California

1   evidence of Petitioner's guilt.  However, the strength of the prosecution's case was Tran's

2   testimony, which was corroborated through the testimony of many other witnesses besides

3   Henry and Kathy during Petitioner's trial.  Therefore, the Court finds that, despite the use of the

4   allegedly perjured testimony, Petitioner received a trial resulting in a verdict worthy of

5   confidence.  Accordingly, Petitioner fails to demonstrate that the admission of their testimony

6   was a violation of due process.

7   **IV.    Trial Counsel's Failure to Move to Suppress Statements of Henry Chung and**
        **Kathy Nguyen.**

8

9        Relatedly, Petitioner contends that because the statements from Henry Chung and Kathy

10  Nguyen were a product of police coercion, trial counsel provided ineffective assistance by

11  failing to move to suppress these statements.  (Pet. at 14.)  Petitioner claims that he wanted his

12  attorney to cross-examine Henry and Kathy about whether their statements were coerced, but

13  that counsel refused to do so. (Trav., Ex. 1 (Tin Tri Nguyen Decl., ¶¶ 3-5).)  In order for

14  Petitioner to prevail on this claim, he must show that trial counsel's performance fell below an

15  objective standard of reasonableness and that counsel's errors were so serious as to deprive the

16  Petitioner of a fair trial, a trial whose result is reliable.  *Strickland*, 466 U.S. at 688.

17       As discussed *supra*, the admission of the statements of Henry Chung and Kathy Nguyen

18  was not prejudicial to the Petitioner because there was sufficient evidence to support the verdict

19  without these statements.  Thus, Petitioner was not prejudiced by trial counsel's alleged failure

20  to object to the introduction of those statements and therefore fails to show ineffective

21  assistance of counsel

22  **V.    Sufficiency of the Evidence.**

23       Petitioner next claims that the evidence presented during trial was insufficient to support

24  the jury's finding that Petitioner shot Vuckovic.  The Court of Appeal was the last state court to

25  address the merits of this claim in a reasoned decision, and as such, the Court looks to that

26  court's analysis of this claim.  (Answer, Ex. 6.)

27       The Due Process Clause "protects the accused against conviction except upon proof

28  beyond a reasonable doubt of every fact necessary to constitute the crime with which he is

    charged." *In re Winship*, 397 U.S. 358, 364 (1970).  A state prisoner who alleges that the

**United States District Court**
For the Northern District of California

1    evidence in support of her state conviction cannot be fairly characterized as sufficient to have

2    led a rational trier of fact to find guilt beyond a reasonable doubt therefore states a

3    constitutional claim, which, if proven, entitles her to federal habeas relief.  *Jackson v. Virginia*,

4    443 U.S. 307, 321, 324 (1979).

5            A federal court reviewing collaterally a state court conviction does not determine

6    whether it is satisfied that the evidence established guilt beyond a reasonable doubt.  *Payne v.*

7    *Borg*, 982 F.2d 335, 338 (9th Cir. 1992), cert. denied, 510 U.S. 843 (1993).  The federal court

8    "determines only whether, 'after viewing the evidence in the light most favorable to the

9    prosecution, any rational trier of fact could have found the essential elements of the crime

10   beyond a reasonable doubt.'"  *See id.* (quoting *Jackson*, 443 U.S. at 319).  Only if no rational

11   trier of fact could have found proof of guilt beyond a reasonable doubt, may the writ be granted.

12   *See Jackson*, 443 U.S. at 324; *Payne*, 982 F.2d at 338; *Miller v. Stagner*, 757 F.2d 988, 992-93

13   (9th Cir.1985), *amended*, 768 F.2d 1090 (9th Cir. 1985); *Bashor v. Risley*, 730 F.2d 1228, 1239

14   (9th Cir. 1984).

15           On habeas review, a federal court evaluating the evidence under *In re Winship* and

16   *Jackson* must consider all of the evidence presented at trial.  *LaMere v. Slaughter*, 458 F.3d

17   878, 882 (9th Cir. 2006).  If confronted by a record that supports conflicting inferences, a

18   federal habeas court "must presume – even if it does not affirmatively appear on the record –

19   that the trier of fact resolved any such conflicts in favor of the prosecution, and must defer to

20   that resolution."  *Jackson*, 443 U.S. at 326.  A jury's credibility determinations are therefore

21   entitled to near-total deference.  *Bruce v. Terhune*, 376 F.3d 950, 957 (9th Cir. 2004).  Except in

22   the most exceptional of circumstances, Jackson does not permit a federal habeas court to revisit

23   credibility determinations.  *See id.*

24           Uncontradicted testimony is not necessarily undisputed evidence.  *United States v.*

25   *Sandoval-Mendoza*, 472 F.3d 645, 649 (9th Cir. 2006).  Jurors may reject uncontradicted

26   testimony when cross examination, other evidence, or their own common sense and ordinary

27   experience convince them the testimony is probably false.  *Id.*  Even perfectly plausible

28

1    allegations can be disbelieved if they occur during the course of a generally implausible

2    account. *Id.* (internal quotation marks and citation omitted).

3            After AEDPA, a federal habeas court applies the standards of *Jackson* with an additional

4    layer of deference. *Juan H. v. Allen*, 408 F.3d 1262, 1274 (9th Cir. 2005).  Generally, a federal

5    habeas court must ask whether the operative state court decision reflected an unreasonable

6    application of *Jackson* and *Winship* to the facts of the case. *Id.* at 1275.

7            The Petitioner points to evidence that Tran, and not Petitioner, was the shooter.

8    However, this Court does not determine whether there is evidence which may have supported a

9    different verdict.  Rather, this Court must assume that any conflicts in the evidence were

10   resolved by the jury in favor of the prosecution and must have near-total deference for the jury's

11   credibility determinations.  In this case, the jury heard all of the evidence that Petitioner asserts

12   in support of his claim and still found beyond a reasonable doubt that Petitioner was guilty.  The

13   Court of Appeal in this case held that the proper test to determine a claim of insufficient

14   evidence in a criminal case is:

15           [W]hether, on the entire record, a rational trier of fact could find appellant
             guilty beyond a reasonable doubt.  In making this determination, the
16           appellate court must view the evidence in a light most favorable to
             respondent and presume in support of the judgment the existence of every
17           fact the trier could reasonably deduce from the evidence.

18   (Answer, Ex. 6 at *23.)  In applying this test, the Court of Appeal's determination that

19   there was sufficient evidence for the jury to find that Petitioner was the actual shooter

20   was a determination that was in accordance with clearly established federal law.

21   Therefore, Petitioner cannot obtain relief based on this claim.

22   **VI.    Prosecutorial Conduct During Closing Argument.**

23           During closing argument, the prosecutor commented on Petitioner's failure to

24   subpoena witnesses who could have testified that Petitioner was not at the scene of the

25   crime.  (RT 1417-18.)  Petitioner claims that the prosecutor's comments suggested that

26   Petitioner had to show that he was not guilty, thus shifting the burden of proof in

27   violation of Petitioner's due process rights.  (Pet. at 13.)  The Superior Court was the last

28

United States District Court

For the Northern District of California

state court to address the merits of this claim in a reasoned decision, and as such, the

Court looks to that court's analysis of this claim.  (Answer, Ex. 13.)

The privilege against self-incrimination prohibits a prosecutor from commenting

upon a defendant's failure to testify.  *See Griffin v. California*, 380 U.S. 609, 615 (1965).

Accordingly, a prosecutorial statement is impermissible "if it is manifestly intended to

call attention to the defendant's failure to testify, or is of such a character that the jury

would naturally and necessarily take it to be a comment on the failure to testify."  *Lincoln*

*v. Sunn*, 807 F.2d 805, 809 (9th Cir. 1987).  "While a direct comment about the

defendant's failure to testify always violates *Griffi*n, a prosecutor's indirect comment

violates *Griffin* only 'if it is manifestly intended to call attention to the defendant's

failure to testify, or is of such a character that the jury would naturally and necessarily

take it to be a comment on the failure to testify.'" *Hovey v. Ayers*, 458 F.3d 892, 912 (9th

Cir. 2006) (quoting *Lincoln v. Sunn*, 807 F.2d 805, 809 (9th Cir. 1987)).  A prosecutor

may call attention to the defendant's failure to present exculpatory evidence, as long as

the comment is not phrased to call attention to the defendant's own failure to testify.

*United States v. Lopez-Alvarez*, 970 F.2d 583, 595-96 (9th Cir. 1992).

Where the prosecutor does call attention to the defendant's own failure to testify,

reversal is required only if "(1) the commentary is extensive; (2) an inference of guilt

from silence is stressed to the jury as a basis for the conviction; and (3) [] there is

evidence that could have supported acquittal." *Jeffries v. Blodgett*, 5 F.3d 1180, 1192

(9th Cir. 1993) (quoting *Lincoln*, 807 F.2d at 809).  Further, an improper comment

warrants habeas relief only if it results in actual prejudice.  *Jeffries*, 5 F.3d at 1190 (citing

*Brecht*, 507 U.S. at 637-38); *see also Shaw v. Terhune*, 380 F.3d 473, 478 (9th Cir. 2004)

(prosecutorial misconduct that rises to level of due process violation warrants habeas

relief only if misconduct is prejudicial under *Brecht*)).

In denying this claim, the Superior Court held that

the prosecutor only made a rhetorical comment to apparently point out that
petitioner had to have been involved in the crime otherwise petitioner's
whereabouts couldn't be explained.  This comment appears to be nothing

United States District Court

For the Northern District of California

United States District Court
For the Northern District of California

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

more than a comment on the defendant's failure to introduce material evidence or to call logical witnesses.  Such comments are not improper.

*Id.* at 15.  The Superior Court's determination was not contrary to clearly established federal law nor did it result in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the state trial court proceeding.  In this case the prosecutor did not make any reference to Petitioner's own failure to testify, and did not ask the jury to conclude that Petitioner did not testify because he was guilty.  Instead, the prosecutor "asked the jury to consider, in weighing the evidence, that the defense did not rebut certain evidence presented by the prosecution."  *United States v. Castillo*, 866 F.2d 1071, 1083 (9th Cir. 1988).   As such, the Superior Court did not err in finding that the prosecutor's comment was not improper and therefore Petitioner is not entitled to federal habeas relief on this claim.

**VII.     Failure to Object to Prosecutorial Misconduct in Closing.**

Relatedly, Petitioner argues that his trial counsel should have objected to the prosecutor's comment about Petitioner's failure to call relevant witnesses, as discussed *supra*.  This claim was not addressed by either the Court of Appeal in the direct appeal or the Superior Court's habeas corpus decision.

To succeed on an ineffective assistance of counsel claim, Petitioner must show that his trial counsel's performance fell below an objective standard of reasonableness, and that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.  *Strickland*, 466 U.S. at 688.  As discussed *supra*, the prosecutor did not act improperly in bringing the jury's attention to the fact that Petitioner's trial counsel did not call relevant witnesses.  Additionally, trial counsel argued in his closing argument that the prosecutor's case was not strong enough for him to meet his burden of proof, and that thus Petitioner did not have to present witnesses.  Simultaneously arguing that Petitioner did not need to present witnesses and objecting to prosecutor's comment regarding counsel's failure to produce witnesses may have weakened Petitioner's case in the jurors' eyes.  The Court thus finds that trial counsel's decision not to object to the prosecutor's comment falls squarely within the category of trial tactics and counsel's

23

United States District Court

For the Northern District of California

1    actions were not objectively unreasonable.  Even if the prosecutor's comment was proper

2    and trial counsel was ineffective for failure to object, Petitioner was not prejudiced.

3    Because Petitioner cannot show that he was prejudiced by an objectively unreasonable

4    performance by his trial counsel, he is not entitled to federal habeas relief on this claim.

5
6    **VIII.   The Trial Judge's Denial of Tony Nguyen's Request for an Interpreter and
         Comment on His English Competency.**

7          Petitioner contends that the trial judge violated his constitutional right to due

8    process, right to a fair trial, and right to confront witnesses when the judge refused to

9    provide an interpreter for Tony Nguyen and commented on Tony's English competency.

10         Petitioner argues that the lack of an interpreter made Tony appear evasive when

11   he took the stand.  (Pet.'s Mem. at 11-12.)  Petitioner now submits a declaration, made

12   five years after trial, in which Tony states that he could not "understand all the questions

13   of the prosecuting attorney," and that he "could not express what [he] wanted to say"

14   because the court "did not give [him] an interpreter."  (Traverse, Ex. 1 (Declaration of

15   Tony Nguyen at 4-5).)  The following exchange occurred between Tony, the trial judge,

16   and Mr. Mendoza, the prosecutor:

17         Mendoza: Do you remember stating to the officer that you did have a conversation
           with your brother on the phone?
18         Tony: Like I say, I only -- whenever he call, I pick up the phone to talk to him.  But
           I didn't know time or date or anything else beside that.
19         Mendoza: I'm not talking about the time or date, sir.
           Tony: My English not very good.
20         Mendoza: I'm just speaking about whether or not you told the officer on the phone
           that you had a conversation with your brother regarding this crime.
21         Tony: No.
           Mendoza: You didn't tell the officer that.
22         Tony: No.  I did not tell officer what going on.
           The Court: I'm sorry Mr. Mendoza.  I'm not sure of your answer, sir.  Are you -- the
23         question is twofold: one is whether or not you had the conversation with your
           brother, and the second question is whether or not you told this officer you had a
24         conversation with your brother.  Do you understand the difference between those two
           questions?
25         Tony: No, I don't.  I need a translater.(sic)  Maybe understand more, because, one,
           I'm nervous.
26         The Court: I think you understand.  Clearly, from the answers and the questions that
           you've been given, you understand English well enough to understand what I'm
27         asking you.
           Tony: Uh-huh.
28         The Court: Now, the first question is did you have a conversation with your brother
           concerning this alleged crime?

                                          24

1   Tony: No, I didn't.
2   The Court: All right.  Now, the second question is did you tell the officer when he called you on the phone that you did or did not have a conversation with your brother?
3   Tony: Yes, I did.  I talk to officer.  Yes, I told him that.

4   (RT 385-86.)

5   Courts have addressed whether denying habeas corpus petitioners an interpreter

6   violates their constitutional rights.  The Ninth Circuit has held that a defendant whose

7   fluency in English is so severely impaired as to inhibit comprehension of the proceedings

8   and/or interfere with the exercise of his constitutional rights has a constitutional right to an

9   interpreter.  *See United States v. Lim*, 794 F.2d 469, 470-71 (9th Cir. 1986), *cert. denied*,

10  479 U.S. 937 (1986).  The failure to provide a defendant with an interpreter to help him

11  understand those who testify against him may implicate his Sixth Amendment right to

12  confront witnesses against him, *see id.* at 470, and may even violate due process by

13  rendering the trial fundamentally unfair.  *See Valladares v. United States*, 871 F.2d 1564,

14  1566 (11th Cir. 1989).  Further, the failure to provide the defendant with an interpreter so

15  that he may deliver his own testimony clearly implicates the defendant's Fifth

16  Amendment right to testify on his own behalf.  *See United States v. Mayans*, 17 F.3d

17  1174, 1181 (9th Cir. 1994).  However, despite these opinions from the circuits, the United

18  States Supreme Court has not yet recognized a constitutional right to a court-appointed

19  interpreter.  *United States v. Si*, 333 F.3d 1041, 1043 n.3 (9th Cir. 2003).

20  Petitioner, alters the typical argument and instead claims that denying the

21  prosecution's witness an interpreter somehow violates the Petitioner's constitutional

22  rights.  Petitioner argues that due process requires the appointment of an interpreter in

23  criminal proceedings where it is necessary, and that in order to comport with the right to

24  confrontation, the trial judge should provide whatever aid the circumstances permit to

25  facilitate witness testimony, including providing an interpreter.  (Pet.'s Memo. at 29.)

26  However, there is no clearly established federal law extending any such right to witnesses.

27  Even assuming that these constitutional doctrines extend past defendants to

28  witnesses, the use of interpreters in any event is a matter for the trial court's discretion.

**United States District Court**
For the Northern District of California

*Gonzalez v. United States*, 33 F.3d 1047, 1051 (9th Cir. 1994).  In the face of an uncontradicted statement that a defendant needs an interpreter, a trial court must satisfy itself through personal observation that the defendant has no difficulty speaking English before an interpreter is denied or withdrawn.  *See Mayans*, 17 F.3d at 1180; *see also Gonzalez*, 33 F.3d at 1049-51 (lack of interpreter does not violate 5th or 6th Amendment where record of district court's sua sponte inquiry supported finding that defendant's language difficulties not "major" problem).  If the discretion to deny an interpreter for a testifying defendant lies with the court, so does the discretion to deny an interpreter for a testifying witness.  In this case, the trial judge, having observed Tony Nguyen's testimony to that point, was satisfied that Tony could testify competently.  The Court's assessment was not contrary to clearly established federal law, nor was it a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding.  Tony's trial testimony, while not grammatically perfect, shows that he could understand and speak English.  When Tony was confused by the structure of the prosecutor's questions, the judge properly clarified the questions, after which Tony appeared to understand clearly what the prosecutor was trying to ask.  Thus, the judge properly exercised his discretion in denying Tony an interpreter.

Petitioner next claims that the trial judge made an improper comment when he stated, "I think you understand.  Clearly, from the answers and the questions that you've been given, you understand English well enough to understand what I'm asking you." (RT 386.)  The Superior Court was the last state court to address the merits of this claim in a reasoned decision, and as such, the Court looks to that court's analysis of this claim. (Answer, Ex. 13.)

In its decision denying Petitioner's habeas petition, the Superior Court held that a court may properly control the questioning of a witness and comment on the evidence and credibility of witnesses, as long as the court does not persistently make discourteous and disparaging remarks so as to discredit the defense or create the impression that it is allying itself with the prosecution.  (Answer, Ex. 13.)  The court found that the trial court's

United States District Court

For the Northern District of California

1    comment regarding Tony's English did not amount to a "persistent attack that in any way

2    discredited the defense."  (*Id.*, Ex. 13 at 15.)

3           A trial judge is "more than an umpire."  *United States v. Laurins*, 857 F.2d 529,

4    537 (9th Cir. 1988).  It is generally appropriate for a trial judge to take part where

5    necessary to clarify testimony and assist the jury in understanding the evidence.  *See id.*  It

6    is also generally appropriate for a trial judge to participate in the examination of witnesses

7    for the purpose of clarifying the evidence, confining counsel to evidentiary rulings,

8    controlling the orderly presentation of the evidence, and preventing undue repetition of

9    testimony.  *United States v. Morgan*, 376 F.3d 1002, 1008 (9th Cir. 2004).  A trial judge's

10   participation oversteps the bounds of propriety and deprives the parties of a fair trial only

11   when the record discloses actual bias or leaves the reviewing court with an abiding

12   impression that the judge's remarks and questioning projected to the jury an appearance of

13   advocacy or partiality.  *See United States v. Parker*, 241 F.3d 1114, 1119 (9th Cir. 2001).

14          This Court finds that the Superior Court did not err in finding that the prosecutor's

15   comment was not improper and therefore Petitioner is not entitled to federal habeas relief

16   on this claim.  The record does not disclose any actual bias or impropriety on the part of

17   the trial judge when he denied Tony's request for an interpreter and commented on Tony's

18   ability to speak English.  The content, context, and tone of the trial judge's comment on

19   Tony's English can hardly be said to overstep the bounds of judicial propriety.  Moreover,

20   for both of these contentions, habeas relief is warranted only if the constitutional errors at

21   issue are prejudicial.  In this case, Petitioner suffered no prejudice from the exchange

22   between the judge and Tony Nguyen and the trial court's refusal to provide Tony Nguyen

23   an interpreter.

24   **IX.    Refusal of Petitioner's Request for an Interpreter.**

25          Relatedly, Petitioner contends that trial counsel should have objected when the

26   judge refused to provide an interpreter for witness Tony Nguyen.  Petitioner must show

27   that his trial counsel acted in an objectively unreasonable manner and that this ineffective

28   performance was prejudicial.  *See Strickland*, 466 U.S. at 687.  As discussed above, there

**United States District Court**
For the Northern District of California

1    is no clearly established federal law providing witnesses with a right to an interpreter and

2    the trial judge did not err in refusing to provide Tony Nguyen with an interpreter.

3    Moreover, as discussed above, the Petitioner was not prejudiced by the trial judge's

4    refusal to provide Tony Nguyen with an interpreter, and thus, Petitioner cannot

5    demonstrate any prejudice from his counsel's failure to object to the judge's ruling.  As

6    Petitioner cannot show prejudice or that his trial counsel acted in an objectively

7    unreasonable manner, Petitioner is not entitled to federal habeas relief on this claim.

8    **X.    Appellate Counsel's Failure to Raise Issues.**

9        Petitioner argues that on direct appeal, his appellate counsel was ineffective for

10   failing to raise trial counsel's inaction regarding the interpreter, witness preparation,

11   prosecutorial misconduct, and the suppression of witness statements.  (Pet. at 6.)  The Due

12   Process Clause of the Fourteenth Amendment guarantees a criminal defendant the

13   effective assistance of counsel on his first appeal as of right.  *See Evitts v. Lucey*, 469 U.S.

14   387, 391-405 (1985).  Claims of ineffective assistance of appellate counsel are reviewed

15   according to the standard set out in *Strickland*.  *Miller v. Keeney*, 882 F.2d 1428, 1433

16   (9th Cir. 1989); *United States v. Birtle*, 792 F.2d 846, 847 (9th Cir. 1986).  A defendant

17   therefore must show that counsel's advice fell below an objective standard of

18   reasonableness and that there is a reasonable probability that, but for counsel's

19   unprofessional errors, he would have prevailed on appeal. *Miller*, 882 F.2d at 1434 & n.9

20   (citing *Strickland*, 466 U.S. at 688, 694; *Birtle*, 792 F.2d at 849).

21       It is important to note that appellate counsel does not have a constitutional duty to

22   raise every nonfrivolous issue requested by a defendant.  *See Jones v. Barnes*, 463 U.S.

23   745, 751-54 (1983); *Gerlaugh v. Stewart*, 129 F.3d 1027, 1045 (9th Cir. 1997); *Miller*,

24   882 F.2d at 1434 n.10.  The weeding out of weaker issues is widely recognized as one of

25   the hallmarks of effective appellate advocacy.  *See id.* at 1434.  Appellate counsel

26   therefore will frequently remain above an objective standard of competence and have

27   caused his client no prejudice for the same reason – because he declined to raise a weak

28   issue. *Id.*

In this case, as described above, Petitioner's arguments regarding these four issues are without merit.  By not raising these issues on appeal, appellate counsel was merely weeding out his weaker arguments.  Therefore, appellate counsel's performance does not fall below the objective standard of reasonable performance and Petitioner is not entitled to federal habeas relief on this claim.

**CONCLUSION**

For the foregoing reasons, the petition for a writ of habeas corpus is DENIED. The clerk shall enter judgment in favor of Respondent and close the file.

**IT IS SO ORDERED.**

Dated: March 30, 2009

JEFFREY S. WHITE
UNITED STATES DISTRICT JUDGE

**United States District Court**
For the Northern District of California

29